Opinion issued April 30, 2013



In The

# Court of Appeals

For The

## First District of Texas

———————————

### NO. 01-06-00779-CR

———————————

## MARTIN HERNANDEZ, Appellant

## V.

## THE STATE OF TEXAS, Appellee

On Appeal from the 185th District Court
Harris County, Texas
Trial Court Case No. 1074124

## MEMORANDUM OPINION

A jury found Martin Hernandez guilty of murder. After finding an enhancement paragraph to be true, the jury assessed his punishment as life imprisonment, plus a $10,000 fine. In five points of error, Hernandez contends

that (1) the evidence is legally and factually insufficient to support his first-degree-murder conviction, (2) the trial court erred by allowing the in-court identification of Hernandez, (3) the trial court erred by admitting expert testimony on the Mexican Mafia and Hernandez's membership in the organization, (4) the trial court erred by failing to exclude a lay witness's testimony about the Mexican Mafia and about Hernandez's membership in the organization, and (5) the trial court erred by allowing the in-court identification of Hernandez's wife, Elizabeth. We affirm the judgment of the trial court.

## Background

Ismael Perez was shot and killed in the parking lot of an after-hours bar named Las Lomas in the early morning hours of Sunday, August 10, 2003. Ismael's older brother, Ariel Perez, was also shot but survived. Hernandez was ultimately arrested and charged with Ismael's shooting. During the guilt or innocence phase of Hernandez's trial, the jury heard from five eyewitnesses, all of whom testified to slightly different versions of the events.

1) **Guilt/Innocence Phase - Eyewitnesses**

   a) **Jose Melendez**

   Jose Melendez is an off-duty security guard who lived a block away from the intersection of Fulton Street and Frawley Street. According to Melendez, there were three bars located at that intersection when the shooting occurred—Santos,

2

Pinos, and Las Lomas—and Melendez frequently went there looking for his father. Las Lomas is an after-hour bar where patrons, like Melendez's father, would go after Santos and Pinos closed at 2 a.m. On the night of the shooting, Melendez got off of work and went to Las Lomas looking for his father. He arrived at Las Lomas around 2:35-2:40 a.m. Less than ten minutes later, Melendez was standing outside of the entrance talking with the bar's security guard when two men he identified as "Luis" and "Cuate" exited the bar arguing. "Cuate" is Ariel Perez's nickname. According to Melendez, the argument escalated into a physical fight in the parking lot across the street from the bar. Melendez testified that Ariel did not appear interested in fighting and that Luis appeared to be the instigator.

According to Melendez, another man and a woman exited Las Lomas shortly after Luis and Ariel. The man, who Melendez had previously seen walking in and out of the bar that evening, was wearing a long-sleeved shirt and blue pants and had short, combed-back hair, a mustache, and a small goatee. Melendez watched as the couple walked across the street to a white Pontiac Grand Am with black tinted windows that was parked in the same parking lot where Luis and Ariel were fighting. Melendez saw the man put the woman in the passenger seat before retrieving an assault rifle from the driver's side of the vehicle. The man then walked around the back of the other vehicles parked near the rear of the lot and walked up behind where Luis and Ariel were fighting. According to Melendez, the

3

gunman fired a shot in the air, and then shot Ariel, who had just been punched by Luis and was attempting to get up off the ground.

Melendez testified that a woman he knew as Sylvia jumped on the gunman's back at that point and was trying to break up the fight. The woman was later identified as Sylvia Guerra, Ariel's estranged common-law wife. According to Melendez, the gunman threw Sylvia off and then turned around and pointed the assault rifle at her as she lay on the ground. The gunman walked away when someone yelled out, "not her." Melendez saw the gunman and Luis walking to the white Pontiac when Ariel's brother came running from the parking lot of another bar across the street. Ariel's brother, Ismael Perez, grabbed Luis and began fighting with him. When Ismael fell to the ground, the gunman walked up to within two feet of Ismael and shot him in the arm, leg, and chest. The gunman then walked back to the white Pontiac, threw the rifle in the back seat, and drove off with the woman still sitting in the passenger seat, and Luis, who had jumped in the back seat after grabbing Ismael's chain necklace and wallet. Melendez believed that the license plate numbers of the Grand Am were "C, H, P or F" and either "95" or "9S."

Melendez, who denied drinking alcohol or using drugs either before or after he arrived at Las Lomas that evening, remained at the scene and gave a videotaped interview to police later that morning. He reviewed a book of 40-50 photos at the

4

police station, but was unable to identify anyone. Melendez testified that the police came to his home three times between August 10, 2003 and December 1, 2005, and each time they brought two or three photo arrays with them. On one such occasion, nine months after the shooting, Melendez identified Luis Olvera as the "Luis" he saw fighting with the Perez brothers. On December 1, 2005—more than two years after the shooting—Melendez identified Hernandez from a photo array as the person who shot Ismael and Ariel Perez. Melendez stated that he was positive that Hernandez was the gunman when the police showed him the photo array. Melendez also identified both Hernandez and Olvera at trial.

Melendez, who was standing about thirty-five feet away from the melee, acknowledged during cross-examination that there may have been some discrepancies between his trial and grand jury testimony, but it was essentially the same. In particular, Melendez conceded that the gunman probably fired five to eight shots; as opposed to the twenty shots he told the grand jury. Melendez also admitted that he told the grand jury that Ariel, Ismael, Olvera, and Sylvia were together in the parking lot across the street when Ariel was shot, even though he testified at trial that Ismael ran across the street after Ariel was shot. Melendez also told the grand jury that Ismael was going after the gunman when he was shot, not lying on the ground as he had testified earlier. He also acknowledged that

5

although he testified at trial that Guerra jumped on the gunman's back, he told the grand jury that no one had gotten near the gunman.

### b) Ariel Perez

Ariel Perez testified that he had had five or six mixed drinks at another bar before going to Las Lomas to meet his brother, Ismael, on August 10, 2003. He arrived shortly after 2:00 a.m. and was, by his own account, intoxicated. Ariel parked across the street from the bar and as he was crossing the street, he was approached by "Luis," who he had known as a teenager. Luis was angry with him and they argued. After Luis took off the football jersey he had been wearing and threw it to the ground, the two men began to fight. Ariel said that he pushed Luis to the ground and tried to walk away. His brother Ismael walked over at that point and began arguing with Luis. Luis and Ismael's argument quickly escalated into a physical fight. Ariel said he was standing back and watching the two men fight when he was shot without warning.

Ariel, who lost consciousness after he was shot, did not see Guerra, the man who shot him, or the gun. Although he had vague memories of speaking with paramedics, he did not regain full consciousness until he awoke in the hospital three days later. Ariel testified that he later identified Luis Olvera in a photo array as the person named "Luis" with whom he and Ismael had been fighting with that night.

### c) Sylvia Guerra

Sylvia Guerra testified that she and her brother-in-law, Ismael, were at Las Lomas that night. Guerra saw two men enter the bar—one man was bald, with a tattoo on the back of his head, and wearing a football jersey, the other man was tall, light-skinned, but had no other distinguishing characteristics that she could remember. Guerra watched as the two men walked over to where Ismael was playing pool. The bald man in the jersey briefly greeted Ismael and hugged him before walking away. According to Guerra, the bald man made a furtive gesture to his taller companion when he hugged Ismael. As the two men were leaving, Guerra also saw a woman, who was dancing with another man, make some sort of gesture to the man in the jersey, who responded by nodding his head in apparent agreement.

As soon as the two men walked out of the bar, Ismael's phone rang and he went outside to answer it. Guerra's phone rang a few minutes later and she, too, exited the bar to answer her phone. Guerra explained that while she was outside, she started talking to her nephew, Jose Gomez, who had just driven up in his car. Guerra testified that she saw her estranged husband, Ariel, park his truck and walk over to the Las Pinos parking lot, where Ismael was talking with the two men she had just seen in the bar. Guerra heard the man in the jersey cursing loudly at Ariel

7

and Ariel respond, "You want to fight me while I'm drunk?" Guerra was concerned and walked over to where the men were arguing.

The argument quickly erupted into a physical fight after the man in the jersey threw a punch at Ariel. According to Guerra, Ariel was on the ground, trying to get up when a third man, who was standing next to Guerra, shot him with an AK-47. Thinking that the gunman was going to shoot Ariel again, Guerra jumped on the gunman's back. She threw herself off of his back, landed on the ground and he pointed the gun at her. She heard someone yell "no, not her" and the gunman walked away from her.

Guerra said that she was lying on the ground dialing 9-1-1 when she heard more gunshots and looked up and saw that Ismael had been shot. Guerra testified that Ismael was lying on the ground with the man in the jersey on top of him when he was shot. Guerra did not see who shot Ismael; she only saw one gun and she assumed it was the same man who had previously shot Ariel, but she did not know.

According to Guerra, the gunman and the man in the jersey ran to the white Grand Am with tinted windows and drove away. Guerra testified that the gunman drove, the man in the jersey was in the backseat, and the woman she had seen dancing in the bar was sitting in the passenger seat. Guerra stated that the man in the jersey took Ismael's gold chain necklace before leaving in the car.

Although Guerra did not remember what the gunman looked like at trial, the morning of the shooting Guerra told police that the gunman was tall, about 180 pounds, and wore a blue buttoned-up shirt with white stripes. Guerra testified that she viewed a photo array on August 20, 2003, and identified a man in one of the photos as someone with an 80% chance of being the gunman. Guerra also admitted that she was shown another photo array on May 28, 2004 and that time she identified Jose Antonio Lancon as the gunman. Guerra testified that she knew Lancon, and that he was the man standing next to her who shot her husband and brother-in-law. Guerra admitted that she told the grand jury that she did not see Lancon with a gun.

Over the objection of defense counsel, the trial court allowed the State to bring Elizabeth Hernandez into the courtroom and Guerra identified her as the woman she had seen dancing in Las Lomas, who was sitting in the passenger seat of the white Grand Am that sped away after the shooting. On cross-examination, Guerra admitted that she and Elizabeth had been sitting near each other in the courthouse hallway for a few days waiting to testify. She also admitted that an investigator had shown her an individual picture of Elizabeth instead of a six-person photo array for purposes of identifying the woman in the white Grand Am.

### d) Jose Gomez

Ariel and Ismael's nephew, Jose Gomez, testified that he had been talking to

9

Sylvia for a few minutes in front of Las Lomas when she suddenly walked off. Gomez got out of his car and watched Sylvia walk over to where Ariel was arguing with a shirtless, tattooed man across the street.[1] According to Gomez, Ismael, who had been trying to calm things down, suddenly started fighting with the tattooed man. Gomez testified that he saw another man emerge from a white Grand Am with an AK-47 and fire two shots at Ariel. The gunman then shot Ismael, who was wrestling on the ground with the tattooed man. According to Gomez, the gunman was standing less than a foot away from Ismael when he shot him three times. Gomez briefly followed the gunman in his car as he left the scene with three other people, one of whom appeared to be a woman, in a white four-door Grand Am with tinted windows. According to Gomez, the Grand Am was moving when the gunman got into the car. Gomez testified that he could not identify the gunman.

### e) Luis Olvera

Luis Olvera testified that he went to Las Lomas with his girlfriend the night of the shooting to meet Hernandez, but his girlfriend changed her mind as soon as they arrived, and she waited in the car for him while he went in to tell Hernandez that he would not be staying. Olvera said that he spoke with "Anthony Lancon,"

---

[1] Gomez testified that the shirtless man had the word "Loy" tattooed on his back. Olvera, who admitted to arguing and fighting with Ariel and Ismael, testified that his nickname, "Lou" was tattooed on his back.

Raymond Torres, and another man in the parking lot outside Pinos for about ten to fifteen minutes before went into Las Lomas.

When he arrived at Las Lomas, Olvera spoke briefly with Hernandez, who was there with a woman Olvera did not know, but he believed to be Hernandez's "girl." Olvera also spoke with Ismael Perez for "about a minute." According to Olvera, Ismael and his brother Ariel were acquaintances of his that he knew from childhood.

Olvera, who was in the bar less than five minutes, left Las Lomas by himself and walked back across the street to talk to Lancon, Torres, and the other man. While he was talking to Lancon and the others, Olvera saw Ariel walking over from the Santos parking lot and called out to him. According to Olvera, Ariel, who seemed intoxicated or "on something" immediately started "going off" on Olvera and tried to hit him. Olvera "lost his cool," and took off the football jersey he wearing to get ready to fight. By this time, a crowd of about fifty people had gathered outside the bars and in the parking lot. According to Olvera, Ariel's brother Ismael showed up about that time and Olvera fought with both brothers. He admitted that Ariel and Ismael Perez did not have any weapons.

Olvera said that he was wrestling with Ismael on the ground when Hernandez, who had been standing in the crowd, told him to move out of the way. Ismael was shot as Olvera tried to get out of the way. Olvera was also shot in the

11

left hand.  Olvera, who admitted that he did not see the actual shooting, stood up immediately afterwards and saw Hernandez holding a "rifle-type" gun, "probably an AK, SKS." Olvera also saw that Ariel had been shot and was lying on the ground.

Olvera said the crowd quickly dispersed after the shooting and he wanted to get out of there, too, so he jumped into the backseat of Hernandez's car, a white, four-door Grand Am with tinted windows.  According to Olvera, the woman who had been with Hernandez in the bar was driving and Hernandez was sitting in the front passenger seat.  Olvera denied going back to Ismael and taking his chain and wallet.  The next day, Olvera called Hernandez after he saw on the news that one of the brothers had died.  Olvera testified that when he asked Hernandez what had happened, Hernandez replied, "Shit, I just started shooting."

Olvera admitted that he has seven felony convictions and was currently serving a twenty-five-year prison sentence for murder.  Olvera testified that he did not cooperate with the police in this case until they agreed to place him in a special rehabilitation program that that keeps him from being locked in a cell for twenty-three hours a day. He also testified that Sergeant Enrique Muniz with the Texas Department of Public Safety deposited $700 into his prison trust fund, too. Olvera, who was admittedly drunk at the time of the shooting, went to Mexico for eleven months after the shooting.

## 2)  Guilt/Innocence Phase - The Investigation and the Informant

Macario Sosa, a homicide investigator with the Houston Police Department, and his partner were the primary investigators assigned to the case.  Sosa said the initial description they received of the gunman was a Hispanic male, approximately 20 to 23 years old, five-eight to five-ten, wearing a blue button-down shirt with starched blue jeans, with a mustache and a goatee.

Approximately a week after the murder, Sosa prepared three photo arrays that he showed to Melendez, Guerra, and Gomez, but none of them made an identification.  Later that month, Sosa put together a fourth photo array that included a photo of Luis Olvera. Sosa showed the fourth photo array to Guerra and Ariel.  According to Sosa, Guerra said that she was eighty percent sure that Olvera was the gunman. Sosa testified that he had a hard time tracking Melendez down, but he was eventually able to show him the fourth photo array. Melendez identified Olvera only as the "Luis" he saw fighting with Ismael and Ariel.

Several months later, Sosa prepared a photo array that included a photo of Jose Antonio Lancon. Sosa presented the array to both Melendez and Guerra. Melendez did not identify anyone from the photo array.  Guerra, however, identified Lancon as the gunman. As a result of Guerra's identification, Lancon was charged with the murder of Ismael Perez in May 2004.

13

Approximately seven months after Lancon was charged—and over two years after the shooting—Sosa received information which led him to interview an informant named Paul Ramirez. Ramirez, who had been charged with possession of one to four grams of cocaine and possession with intent to deliver cocaine over 500 grams of cocaine, agreed to provide Sosa with information about the shooting at Las Lomas in exchange for the dismissal of both felony charges. Ramirez acknowledged that he also received $1,000 from Sergeant Enrique Muniz and $2,000 from Crime Stoppers for his cooperation in this case.

Ramirez testified that he was working as a wrecker driver in 2003 and was two blocks away from Las Lomas when he heard about the shooting over the radio. When he arrived at the bar, Ramirez spoke with a man he knew named Raymond Torres who told him what had happened. Based on his conversation with Torres, Ramirez met Hernandez at a gas station around 9:30 p.m. that evening and Hernandez told Ramirez about the shooting. Ramirez said that even though he had never met Hernandez before that evening, Hernandez told him about the shooting because both he and Hernandez were members of the same association and he was Hernandez's superior in the association. According to Ramirez, Hernandez told him that he was at Las Lomas with his wife when he ran into Raymond Torres; Torres took him across the street to meet Lancon who was also in the association, but whom Hernandez had never met. Hernandez told Ramirez that he was across

14

the street from Las Lomas talking to Torres and Lancon, when "Lou," who was standing there with them "caught eyes" with one of the victims. Hernandez told Ramirez that "Lou" and the other man had "words" and then started fighting. According to Ramirez, Hernandez told him that "Lou" was getting beat up so he told Lancon to go get the SKS. Hernandez said that Lancon got the gun, but would not shoot, so Hernandez took the gun from him and shot the two men. Hernandez told Ramirez that Olvera was shot because he did not get out of the way fast enough.

Ramirez said he had seen Hernandez several times since the shooting. According to Ramirez, Hernandez knew that Lancon had been charged with Ismael's murder, but he was was not worried about Lancon implicating him because Lancon had been in custody and Hernandez believed that if Lancon was going to implicate him, he would have already done so. Ramirez said that he had been to Hernandez's house, had seen a white Grand Am parked at his house, and had met Hernandez's wife. Ramirez identified Elizabeth Hernandez in court as Hernandez's wife.

Ramirez also identified Hernandez from a photo array as the person who admitted to him that he was the gunman at Las Lomas. After interviewing Ramirez, Sosa presented a photo array containing Hernandez's photo to Jose Melendez and Melendez identified Hernandez as the person he saw shoot Ariel and

Ismael Perez. Melendez also identified Hernandez in court as the gunman. Sosa also presented Hernandez's photo array to Guerra and Gomez, but neither of them were able to make an identification. Sosa also showed the photo array to Luis Olvera in January 2006. Olvera identified Hernandez from the photo array and in court as the person he saw holding a weapon immediately after he and Ismael were shot.

The assistant medical examiner testified that one of the bullet entrance wounds was caused by a gun fired less than twelve inches from Ismael's body.

## 3) Guilt/Innocence Phase - The Defense Case

Raymond Torres testified that he went to Las Lomas the night of the shooting with his wife. Torres knows Jose Antonio Lancon and saw him standing outside when he arrived shortly after 2:00 a.m. Torres said that he was inside of Las Lomas for approximately thirty minutes when he heard gunshots. Torres said that he immediately tried to exit the bar, but the security guard would not let them leave and kept them inside for approximately fifteen seconds. When he finally walked outside, Torres saw Lancon jump into a small, white car that was leaving the scene. Torres said that he did not see the shooting. Torres said that he knows Hernandez and did not see him inside or outside of Las Lomas after he heard the gunshots, but admitted that Hernandez could have been in the parking lot and

16

Torres just did not see him. Torres said that he called Paul Ramirez who came to the scene in his wrecker truck.

Larissa Torres testified that she was at Las Lomas with her husband Raymond on the night of the shooting. When they arrived, she saw Lancon standing outside, but she did not see Lancon after the shooting. She had never seen Hernandez prior to testifying at trial but said she did not see him inside or outside Las Lomas the night of the shooting. Larissa said that she did not see the shooting.

**4) Punishment Phase**

Hernandez pleaded "Not True" to the enhancement allegation that he had been convicted of Aggravated Assault with a deadly weapon in Bexar County on May 6, 1992.

During the punishment phase, the State presented evidence of Hernandez's prior convictions for assault, assault on a family member, and the enhancement offense of aggravated assault with a deadly weapon.

Over Hernandez's objection, Paul Ramirez testified that, at the time of the shooting, both he and Hernandez were members of the Mexican Mafia, a criminal organization that made its money by dealing drugs and committing home invasions. Ramirez explained that the Mexican Mafia is composed of Soldiers at the bottom of the hierarchal structure, then Sergeants, Lieutenants, and finally a General at the very top of the organization. At the time of the shooting, Carlos

"Khaki" Ruiz was the General for all of South Texas (including Houston), Ramirez was a Lieutenant for the Houston area who reported directly to Ruiz, and Hernandez, Lancon, and Raymond Torres were Soldiers. Olvera was a prospective member of the Mexican Mafia who later began as a Solider in the organization. Ramirez explained that although prospects are generally required to kill someone in order to join the organization, he joined the Mexican Mafia in prison and rose to the rank of Lieutenant without ever having committed a murder. According to Ramirez, Hernandez had been a Sergeant in Mexican Mafia in San Antonio, but he was demoted to Solider when he went to prison for aggravated assault. After the Perez shooting, Hernandez was promoted to the rank of Lieutenant.

Ramirez testified that Hernandez was acting in accordance with the rules of the Mexican Mafia when he shot Ismael and Ariel Perez. Ramirez explained that according to Mexican Mafia rules, if one member sees someone harming or touching another member, he is required to kill that person. The member who did the killing would have to explain his actions to his superiors, if asked to do so, so that the organization would be able to cover for him if they were ever questioned by police. Ramirez said the Perezes were shot because they were fighting with Olvera who was affiliated with the Mexican Mafia.

Ramirez acknowledged that he left the Mexican Mafia once he signed the contract with the police, but he pretended to remain a member to fulfill the contract

18

terms. Ramirez admitted that he saw Hernandez approximately 40 to 50 times after he signed the contract. He also acknowledged that the organization dictates that informants must be killed if they cooperate with the police.

Enrique Muniz, a Sergeant with the Texas Department of Public Safety, testified as an expert on the Mexican Mafia, over Hernandez's objections. According to Muniz, the Mexican Mafia is a prison gang known for engaging in criminal activities such as extortion, racketeering, smuggling narcotics, burglary, and murder for hire. Muniz testified that the Mexican Mafia is governed by their own set of rules and regulations that members refer to as the Bible or the Constitution. He later admitted that these rules are often ignored or not enforced.

Muniz testified that Hernandez has three tattoos consistent with membership in the Mexican Mafia and that Hernandez is a confirmed member of the Mexican Mafia in the databases of the Texas Department of Criminal Justice and the Texas Department of Public Safety.

The defense presented the testimony of Hernandez's brother-in-law, his cousin, his wife, and a friend who all described Hernandez as a good father to his wife's children and a non-violent, peaceful person. Hernandez's brother-in-law, cousin, and friend all denied knowing that Hernandez was a member of the Mexican Mafia.

Hernandez's wife, Elizabeth, testified that she knew that her husband was a member of the Mexican Mafia. She also testified that she went to Las Lomas on the night of the shooting to meet up with him. According to Elizabeth, she drove to Las Lomas in her husband's Monte Carlo because her Grand Am had been giving her problems. Hernandez met her outside the bar, walked her over to the car, gave her some money, talked briefly with her, and then she left. Elizabeth denied being there when the shooting occurred. She also denied fleeing with her husband in her white Grand Am.

Hernandez testified that he went to Las Lomas by himself in his wife's white Grand Am to meet Olvera. He said that a fight broke out and he turned around and saw Jose Lancon, who he had never met before, coming at him with a gun so he took the gun from him. Hernandez denied taking the gun from his car. Hernandez said there was a large crowed "moving around" and one to two people were "coming at him" so he fired into the ground. He said after he fired into the ground, he saw someone reach for their pocket and he fired again. Hernandez said that he felt his life was in danger when he saw someone with a gun, but then admitted that he did not see anyone with a gun. Hernandez said that the shooting had nothing to do with the Mexican Mafia, but he admitted that he was formerly a member of the organization.

20

Hernandez denied that he ever told Paul Ramirez what happened at Las Lomas and said that everyone who had testified had lied about the events of that evening.

**Discussion**

In five points of error, Hernandez contends that (1) the evidence is legally and factually insufficient, (2) the trial court erred by allowing the in-court identification of Hernandez, (3) the trial court erred by admitting expert testimony on the Mexican Mafia and Hernandez's membership in the organization, (4) the trial court erred by failing to exclude a lay witness's testimony about the Mexican Mafia and about Hernandez's membership in the organization, and (5) the trial court erred by allowing the in-court identification of Hernandez's wife.

## 1) Sufficiency of the Evidence

In his first point of error, Hernandez contends that the evidence is (a) legally insufficient to support the jury's finding that all the essential elements of the offense of murder were proved beyond a reasonable doubt, and (b) legally and factually insufficient to support the jury's rejection of his claim that the murder was committed under the immediate influence of sudden passion arising from an adequate cause.

### a) Murder

We apply the *Jackson v. Virginia* sufficiency standard of review to complaints styled as legal or factual sufficiency challenges concerning the elements of a criminal offense. *Jackson*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *see Ervin v. State*, 331 S.W.3d 49, 52–56 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd) (citing *Brooks v. State*, 323 S.W.3d 893, 898–913 (Tex. Crim. App. 2010)). Under the *Jackson* standard, evidence is insufficient to support a conviction if, considering all the record evidence in the light most favorable to the verdict, no rational fact-finder could have found that each essential element of the charged offense was proven beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009); *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). If the evidence is legally insufficient, then the "only proper verdict" is acquittal. *Tibbs v. Florida*, 457 U.S. 31, 41–42, 102 S. Ct. 2211, 2218 (1982).

Our role is that of a due-process safeguard, ensuring only the rationality of the trier of fact's finding of the essential elements of the offense beyond a reasonable doubt. *See Moreno v. State*, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988). It is the function of the trier of fact to resolve any conflict of fact, to weigh any evidence, and to evaluate the credibility of any witnesses. *See Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). We therefore resolve any

22

inconsistencies in the evidence in favor of the verdict, and we "defer to the jury's credibility and weight determinations." *See Marshall v. State*, 210 S.W.3d 618, 625 (Tex. Crim. App. 2006). Under the *Jackson* standard, any conflicts or inconsistencies in the witness's testimony, including any conflicts regarding the weight of the evidence, are exclusively within the jury's province to resolve. *See Dewberry*, 4 S.W.3d at 740; *Marshall*, 210 S.W.3d at 625 (requiring appellate courts to resolve any inconsistencies in evidence in favor of verdict and "defer to the jury's credibility and weight determinations").

A person commits murder if he intentionally or knowingly causes the death of an individual, or intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. *See* TEX. PENAL CODE ANN. § 19.02(b)(1)-(2) (West 2011).

Hernandez argues that no rational fact-finder could have found beyond a reasonable doubt that he intentionally or knowingly caused the death of Ismael Perez because three of the State's key witnesses were not credible—Melendez, Olvera, and Ramirez. In particular, Hernandez argues that the jury should have discounted their testimony because (1) Melendez's trial testimony conflicted with his grand jury testimony on several relevant facts, (2) Olvera, who was serving a twenty-five year sentence for an unrelated murder, was given $700 in prison commissary funds and was placed in a special prison rehabilitation program with

23

better housing accommodations in exchange for his testimony, and (3) Ramirez, a paid confidential informant, had two felony cocaine possession charges dismissed in exchange for his testimony.

As the fact-finder, the jury is responsible for resolving all of the issues that Hernandez has raised with respect to the testimony of these three witnesses (i.e., conflicts in testimony, weight of the evidence, and credibility of the witnesses). *See Dewberry*, 4 S.W.3d at 740; *Marshall*, 210 S.W.3d at 625. The jury was well-within its province to believe Olvera, Ramirez, and/or Melendez when they testified that Hernandez intentionally caused the death of Ismael Perez, and to disbelieve any evidence to the contrary. *See Dewberry*, 4 S.W.3d at 740; *Marshall*, 210 S.W.3d at 625.

Viewing the evidence in the light most favorable to the verdict, and deferring to the jury's credibility and weight determinations and resolution of conflicting testimony, we conclude that a rational fact-finder could have found, beyond a reasonable doubt, that Hernandez committed the offense of murder. Therefore, we hold that the evidence is legally sufficient to support Hernandez's conviction.

## b) Sudden Passion

Hernandez also challenges the legal and factual sufficiency of the evidence supporting the jury's negative finding on the punishment issue of sudden passion.

24

During the punishment phase of a murder trial, a defendant may reduce a murder charge from a first-degree felony to a second-degree felony by proving by a preponderance of the evidence that "he caused the death under the immediate influence of sudden passion arising from an adequate cause." *See* TEX. PENAL CODE ANN. § 19.02(d) (West 2011); *see also Hernandez v. State*, 127 S.W.3d 206, 211–12 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd) (holding that defendant bears burden at punishment phase to prove issue of sudden passion by preponderance of evidence). "'Sudden passion' means passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation." TEX. PENAL CODE ANN. § 19.02(a)(2). "'Adequate cause' means cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." *Id.* § 19.02(a)(1); *see also Hernandez*, 127 S.W.3d at 211 (holding that ordinary anger or causes of defendant's own making are not legally adequate causes).

Hernandez argues that he met his burden of proof on the issue of sudden passion when he took the stand during the punishment phase and testified that he took the rifle from Lancon and shot Ismael in the heat of passion because he believed that Ismael was coming at him. According to Hernandez, he only fired

25

the rifle because he saw Ismael reaching into his pocket for something (presumably, a weapon) and he was afraid. Hernandez acknowledges that there is evidence that tends to prove that he intentionally murdered Ismael without a sudden passion arising from an adequate cause. Namely, (1) Melendez's testimony that Hernandez shot Ismael from a distance of two feet as he lay on the ground, (2) Gomez's testimony that the shooter was less than a foot away from Ismael when he shot Ismael who was on the ground, (3) Olvera's testimony that Hernandez told him the day of the shooting, "Shit, I just started shooting," (4) Ramirez's testimony that Hernandez admitted that he had no choice but to shoot Ismael with his SKS assault rifle, and (5) the assistant medical examiner's testimony that one of the bullet entrance wounds was caused by a gun fired less than twelve inches from Ismael's body.

Nevertheless, Hernandez argues that the jury should have disbelieved the testimony of Melendez, Olvera, and Ramirez on this issue for the reasons previously discussed. Hernandez also points out that Melendez testified before the grand jury that he saw Luis Olvera and Ariel Perez fighting across the street from where he was standing. Guerra was trying to break up the fight. Melendez told the grand jury that he saw Ismael run over to where Olvera and Ariel were fighting and "that's when the shooting started." Melendez admitted that he testified before the grand jury that after the gunman shot Ariel, Ismael rushed the gunman.

26

### i) Legal Sufficiency—Sudden Passion

We review challenges to the legal sufficiency of the evidence with respect to issues on which the defendant had the burden of proof by a preponderance of the evidence, like sudden passion, under the legal sufficiency standard utilized in civil cases. *See Smith v. State*, 355 S.W.3d 138, 147–48 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd); *see also Cleveland v. State*, 177 S.W.3d 374, 387–88 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd). The civil legal sufficiency standard requires a two-step analysis. First, we examine the record for any evidence that supports the jury's negative finding while ignoring all evidence to the contrary. *See Smith*, 355 S.W.3d at 148; *Cleveland*, 177 S.W.3d at 387. Second, if no evidence supports the negative finding, then we examine the entire record to determine whether the evidence establishes the issue as a matter of law. *Smith*, 355 S.W.3d at 148; *Cleveland*, 177 S.W.3d at 387. We must defer to the fact-finder's determination of the weight and credibility to give the testimony and the evidence at trial. *See Cleveland*, 177 S.W.3d at 388–89.

With respect to the legal sufficiency of the evidence on this issue, we must first examine the record for any evidence that supports the jury's negative finding on the mitigating issue of sudden passion while ignoring all evidence to the contrary. *See Smith*, 355 S.W.3d at 148; *Cleveland*, 177 S.W.3d at 387. Here, as Hernandez points out in his brief, there is some evidence supporting the jury's

negative finding (i.e., Hernandez's statements to Ramirez and Olvera the day after the shooting, Melendez, Gomez, and the medical examiner testimony regarding the proximity of Ismael Perez to the gunman). Although the jury could have disbelieved this testimony, the jury apparently found all or some of this evidence to be credible, and we must defer to such determinations. *See Cleveland*, 177 S.W.3d at 388–89. Accordingly, we hold that the evidence is legally sufficient to support the jury's negative finding on the punishment issue of sudden passion.

### ii) Factual Sufficiency—Sudden Passion

We review a challenge to the factual sufficiency of the evidence supporting a jury's negative finding on an issue that the defendant had to prove by a preponderance of the evidence under the factual sufficiency standard announced in *Meraz v. State*, 785 S.W.2d 146, 154–55 (Tex. Crim. App. 1990). *See Brooks*, 323 S.W.3d at 924 n.67 (Cochran, J., concurring); *see also Zuniga v. State*, 144 S.W.3d 477, 482 (Tex. Crim. App. 2004) (holding that *Meraz* standard was suitable for sufficiency reviews regarding affirmative defenses because burden of proof on defendant is preponderance of evidence), *overruled on other grounds by Watson v. State*, 204 S.W.3d 404, 416–17 (Tex. Crim. App. 2006); *Cleveland*, 177 S.W.3d at 390–91. The evidence supporting a jury's negative finding on the issue of sudden passion is insufficient if, after considering all relevant evidence, the judgment is so against the great weight and preponderance of the evidence so as to be manifestly

unjust. *Meraz*, 785 S.W.2d at 154–55. In doing so, we review all of the evidence neutrally, and we defer to the fact-finder's determination of the weight and credibility given to any witness's testimony. *Cleveland*, 177 S.W.3d at 390–91.

With respect to Hernandez's challenge to the factual sufficiency of the evidence supporting the jury's negative finding on the issue of sudden passion, we note that the jury could have reasonably disbelieved Hernandez's testimony and Melenez's grand jury testimony that Ismael was rushing Hernandez before he was shot. The jury could have also reasonably believed Ramirez's and Olvera's testimony regarding statements Hernandez made to them the next day, as well as the testimony of various witnesses, including Melendez, who testified that Hernandez retrieved the automatic weapon from the white Grand Am, and then walked over and shot Ariel, and then shot Ismael as he was lying on the ground. From this evidence, a rational jury could have reasonably concluded that Ismael was not provoking Hernandez when the shooting occurred, and, therefore, Hernandez was not acting under the immediate influence of sudden passion arising from an adequate cause when he shot Ismael. After considering all of the relevant evidence, and deferring to the jury's determinations regarding the weight and credibility of the testimony, we cannot say that the judgment is so against the great weight and preponderance of the evidence so as to be manifestly unjust. Accordingly, we hold that the evidence is factually sufficient to support the jury's

negative finding on the punishment issue of sudden passion.

### c) Conclusion

Having held that the evidence is sufficient to support both Hernandez's murder conviction and the jury's negative finding on the punishment issue of sudden passion, we overrule Hernandez's first point of error.

## 2) Admissibility of In-Court Identifications

In his second and fifth points of error, Hernandez argues that the trial court erred by admitting two in-court identifications. Specifically, in his second point of error, Hernandez contends that the trial court erred by admitting Jose Melendez's in-court identification of Hernandez because the identification was tainted by an impermissibly suggestive photographic identification. In his fifth point of error, Hernandez argues that the trial court erred by allowing the in-court identification of his wife, Elizabeth, because the identification was also tainted by impermissibly suggestive pretrial identification procedures.

The admissibility of in-court identifications is generally a mixed question of law and fact that we review de novo. *See Loserth v. State*, 963 S.W.2d 770, 773 (Tex. Crim. App. 1998); *Page v. State*, 125 S.W.3d 640, 646 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd). A pretrial identification may not be so suggestive and conducive to mistaken identification that subsequent use of that pretrial identification at trial would deny the accused due process of law. *Barley v. State*,

906 S.W.2d 27, 32–33 (Tex. Crim. App. 1995) (citing *Stovall v. Denno*, 388 U.S. 293, 87 S. Ct. 1967 (1967)). Similarly, an in-court identification is inadmissible when it has been tainted by an impermissibly suggestive pretrial photographic identification. *Luna v. State*, 268 S.W.3d 594, 605 (Tex. Crim. App. 2008) (citing *Ibarra v. State*, 11 S.W.3d 189, 195 (Tex. Crim. App. 1999)). The test for determining if a pretrial identification procedure is impermissibly suggestive is whether, considering the totality of the circumstances, "the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Luna*, 268 S.W.3d at 605. Reliability is the linchpin in determining the admissibility of identification testimony. *Id.* The following five non-exclusive factors should be "weighed against the corrupting effect of any suggestive identification procedure in assessing reliability under the totality of the circumstances:" (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation. *Id.* (citing *Ibarra*, 11 S.W.3d at 195).

To determine the admissibility of both pretrial identification and potentially tainted in-court identification we employ a two-step analysis: (1) whether the

pretrial identification procedure was impermissibly suggestive; and, if so, (2) whether that suggestive procedure gave rise to a very substantial likelihood of irreparable misidentification. *Barley*, 906 S.W.2d at 33; *Page*, 125 S.W.3d at 646. The defendant must prove both elements by clear and convincing evidence. *Barley*, 906 S.W.2d at 33-34; *Page*, 125 S.W.3d at 646. Only if we determine that the pretrial identification procedure is impermissibly suggestive do we examine whether it tainted the in-court identification. *Barley*, 906 S.W.2d at 34; *Page*, 125 S.W.3d at 646.

With regard to the first prong, it is well established that suggestiveness may arise from the manner in which the pretrial identification procedure is conducted or from the content of the resulting photo array itself. *Barley*, 906 S.W.2d at 33. Suggestiveness may arise from the manner in which the pre-trial identification is conducted if, for example, police point out the suspect or suggest that a suspect is included in the photo array. *Id.* Texas courts have uniformly condemned the practice of showing a single photograph to a prosecuting witness and deride this practice as being inherently suspect and impermissibly suggestive. *See Delk v. State*, 855 S.W.2d 700, 706 (Tex. Crim. App. 1993); *Bond v. State*, 29 S.W.3d 169, 172 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd).

### a) Melendez's In-court Identification of Hernandez

Hernandez does not clearly articulate why he believes that the pretrial

identification procedure utilized in this case was impermissibly suggestive. A careful review of his briefing, however, indicates that Hernandez considers the pretrial procedure to be impermissibly suggestive because Melendez was not shown the photo array with Hernandez's photo until over two years after the shooting, and Melendez viewed this photo array two times before trial. According to Hernandez, these multiple viewings gave Melendez an opportunity to become familiar with Hernandez's photo and served to reassure Melendez that he had identified the right man as the gunman.

The record reflects that the pretrial identification procedure utilized in this case was not suggestive, much less impermissibly so. Investigator Macario Sosa testified that the array containing Hernandez's photograph consisted of photographs of six Hispanic males, all with facial hair commonly described as goatees. Sosa testified that the photographs used in that array were all Texas Driver's License photographs, all of the individuals depicted were wearing civilian clothes and none of the photographs stood out from the others. The copy of the photo array included in the record supports Investigator Sosa's description.

Sosa said that prior to showing Melendez the photo array, he gave him the common admonishments—just as he had done with other photo arrays that he had shown Melendez. Sosa instructed Melendez to view the photo array and to determine if he recognized anyone from the array. Sosa said he did not suggest to

33

Melendez who he should pick out and did not tell him or suggest to him in any way that there was a photograph of a suspect in the array. Sosa said Melendez identified Hernandez's photograph and told Sosa that he was the gunman. Sosa characterized Melendez's identification as a "strong tentative" identification.

Melendez said that the first time he saw the array containing Hernandez's photograph, Investigator Sosa did not tell him that they had a new suspect. Melendez said that he was positive about his identification and that he had no reservations about it. Melendez said that he looked at the array "for like a minute" before he identified Hernandez as the gunman and after he made the identification, he had no further discussions with Sosa. Although he had viewed several other photo arrays prior to identifying Hernandez, Melendez never identified anyone else as the gunman. Melendez said that he had seen the array with Hernandez's picture twice prior to testifying at the suppression hearing, once on the day it was initially shown to him and the second time on the day he testified in front of the grand jury. In light of this evidence and testimony, we cannot say that the pretrial identification procedure utilized in this case was impermissibly suggestive.

Even if the pre-trial identification procedures utilized in this case were suggestive, they did not undermine the reliability of Melendez's in-court identification of Hernandez as the gunman. Melendez testified that he was standing outside the entrance to Las Lomas speaking with the security guard when

the gunman exited the bar, accompanied by a woman. The gunman, who Melendez had previously seen walking in and out of the bar that evening, was wearing a long-sleeved shirt and blue pants with short, combed-back hair, a mustache, and a small goatee. Melendez testified that he watched as the gunman walked across the street and retrieved an assault rifle from a White Grand Am. According to Melendez, the gunman walked up behind the melee and shot both Ariel and Ismael before leaving the scene in the Grand Am. Melendez was the only witness able to provide police with a partial license plate number for the Grand Am.

Although the length of time between the shooting and Melendez's identification of Hernandez from the photo array (over two years) weighs against a finding of reliability, considering the totality of the circumstances, we cannot say that the pretrial identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.

While the shooting occurred across the street from where Melendez was standing, Melendez had ample opportunity to observe the gunman from his vantage point at the entrance to the bar. His description of Hernandez and the get-away car were sufficiently detailed to evidence a heighted degree of attention. Melendez also testified that he positively identified Hernandez as the gunman from

the December 2005 photo array and he did not have any reservations about the identification.

After reviewing the totality of the circumstances, we conclude Hernandez has not shown by clear and convincing evidence that the photo array identification was impermissibly suggestive and that it resulted in a very substantial likelihood of irreparable misidentification at trial. *See Barley*, 906 S.W.2d at 33-34; *Delk*, 855 S.W.2d at 706.

We overrule Hernandez's second point of error.

### b) Guerra's In-court Identification of Hernandez's Wife

Sylvia Guerra identified Elizabeth in court as the woman she had seen dancing in the bar who was sitting in the white Grand Am that the gunman drove off in after he shot Ariel and Ismael. Hernandez argues that Guerra's in-court identification of Elizabeth was tainted by the fact that Guerra had previously identified Elizabeth from a single photograph that was shown to her by a detective months before trial, and by the fact that State kept both Guerra and Elizabeth waiting in the hallway outside of the courtroom for three days during the trial, in order to give Guerra time to observe Elizabeth. Hernandez argued to the trial court that the entire process was extremely prejudicial to him because Guerra previously identified Lancon as the shooter, and the State was essentially trying to cure Guerra's inability to identify Hernandez as the shooter by showing that she could

36

identify his wife as the woman who left with the shooter in the Grand Am.

Admittedly, the previously discussed analysis for determining the admissibility of an in-court identification has only been applied with respect to identifications of *criminal defendants*. Hernandez has not directed us to—and we have not found—any cases requiring the same type of procedural safeguards with respect to the identification of a co-defendant or other third party. Nevertheless, there are strong policy reasons for extending such procedural safeguards, particularly in cases such as this, when the allegedly tainted identification is being used as an indirect way to identify a defendant, or bolster a witness's credibility.

Here, Guerra was standing next the shooter when he shot her husband, Ariel. Guerra, who immediately jumped on the gunman's back, to stop him from shooting again, quickly fell or jumped to the ground. As she was lying there, the gunman shot her brother-in-law, Ismael, at close range, and then walked over to the Grand Am, which Guerra said was parked close by, and drove away with a woman sitting in the passenger seat. Despite her close proximity to the gunman, Guerra was never able to identify Hernandez as the gunman. In fact, she identified Jose Antonio Lancon, another man who was there in the parking lot that night, as the gunman. Guerra's inability to identify the man who shot her husband and brother-in-law, who was standing right next to her, raises serious concerns about her ability to identify a woman sitting in the passenger seat of car that was leaving

37

the scene, especially considering the fact Guerra was still lying on the ground when the gunman and the woman drove away. Under these circumstances, the impermissibly suggestive pre-trial identification practice of showing Guerra a single photograph created a very substantial likelihood of irreparable misidentification.

Although the identification was inadmissible, in light of the record as a whole, any error associated with the admission of this evidence is harmless. A violation of the evidentiary rules resulting in the erroneous admission of evidence is non-constitutional error. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). An appellate court disregards non-constitutional error that does not affect a criminal defendant's "substantial rights." TEX. R. APP. P. 44.2(b); *Casey v. State*, 215 S.W.3d 870, 885 (Tex. Crim. App. 2007). Substantial rights are not affected if, after examining the record as a whole, the reviewing court has a fair assurance that the error did not have a substantial and injurious effect or influence in determining the jury's verdict. *Motilla*, 78 S.W.2d at 355.

The evidence of Hernandez's guilt was strong. Melendez identified Hernandez as the person who shot Ismael. Olvera identified Hernandez as the man holding the assault rifle immediately after Olvera and Ismael were shot. Both Ramirez and Olvera testified that Hernandez admitted to them that he was the gunman. Melendez, Guerra, and Gomez saw the gunman flee in a white Grand

Am; Olvera said he fled with Hernandez in a white Grand Am. Melendez, Guerra, Gomez, and Olvera testified that there was a female in the white Grand Am. Melendez got a partial license plate number of the Grand Am which, although not identical, was consistent with the license plate number of the Grand Am registered to Hernandez's wife. The evidence that Hernandez shot the Perez brothers and then fled in a white Grand Am registered to his wife was overwhelming even without Guerra's in-court identification of Hernandez's wife. *See id.* at 356.

We overrule Hernandez's fifth point of error.

### 3) Admission of Expert Witness Testimony Regarding Mexican Mafia

In his third point of error, Hernandez contends that the trial court erred by allowing DPS Sergeant Enrique Muniz to testify as a gang expert. Specifically, Hernandez claims Sergeant Muniz's testimony should have been excluded under Texas Rule of Evidence 702 because he was not qualified to testify as an expert with respect to the Mexican Mafia, and his testimony was neither reliable nor relevant. Hernandez further contends that even if Muniz's testimony satisfied Rule 702, it should have nevertheless been excluded under Texas Rule of Evidence 403 because the probative value of the testimony was outweighed by its prejudicial effect.

### a) Rule 702

The trial court's decision to admit expert testimony is reviewed under an

abuse of discretion standard and the trial court's ruling will be upheld if it is within the zone of reasonable disagreement. *See Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000). Rule 702 of the Texas Rules of Evidence provides that if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, then a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise. TEX. R. EVID. 702.

Before admitting expert testimony under Rule 702, the trial court must be satisfied that three conditions are met: (1) the witness qualifies as an expert by reason of his knowledge, skill, experience, training, or education; (2) the subject matter of the testimony is an appropriate one for expert testimony; and (3) admitting the expert testimony will actually assist the fact-finder in deciding the case. *Davis v. State*, 329 S.W.3d 798, 813 (Tex. Crim. App. 2010) (citing *Alvarado v. State*, 912 S.W.2d 199, 215–16 (Tex. Crim. App. 1995)). Stated another way, the trial judge must make three separate inquiries before admitting expert testimony—(1) whether the witness is qualified; (2) whether the testimony is reliable; and (3) whether the testimony is relevant. *Vela v. State*, 209 S.W.3d 128, 131 (Tex. Crim. App. 2006).

### i) Qualification

To determine if a witness is qualified, the trial court must first ascertain

whether the witness has a sufficient background in the particular field in which his testimony is sought, and then the trial court must determine whether that background goes to the matter on which the witness is to give an opinion. *Davis*, 329 S.W.3d at 813; *Vela*, 209 S.W.3d at 131. The proponent must establish that the expert has knowledge, skill, experience, training, or education regarding the specific issue before the court that would qualify the expert to give an opinion on that particular subject. *Vela*, 209 S.W.3d at 132. The focus is on the fit between the subject matter at issue and the expert's familiarity with it. *Id.* at 133. Because the spectrum of education, skill, and training is so wide, a trial court has great discretion in determining whether a witness possesses appropriate qualifications as an expert on a specific topic in a particular case. *Davis*, 329 S.W.3d at 813; *Vela*, 209 S.W.3d at 136.

Hernandez argues Muniz is not qualified to testify as an expert with respect to the Mexican Mafia because Muniz testified that he had only been studying the Mexican Mafia for seven years and, although he had amassed 150 hours gang-related classroom training, he never indicated that any of the training he had received focused on the Mexican Mafia.

On the contrary, Muniz testified that he was a State Trooper with the Texas Department of Public Safety for nine years before he moved to the department's criminal intelligence division in 1997. As a sergeant in the criminal intelligence

division, Muniz devotes his time to developing intelligence on organized criminal enterprises, including prison gangs such as the Mexican Mafia. Muniz, who has been studying and collecting information on the Mexican Mafia since 1999, testified that after he joined the criminal intelligence division, he received specialized training on Hispanic gangs, including the Mexican Mafia, from experts in the field, including a law enforcement official in San Antonio who works with the FBI's Gang Task Force, as well as from various officials with the Texas Department of Criminal Justice. Muniz estimated that he had received at least 150-200 hours of classroom training on this topic. Muniz, who is a member of two state-wide organizations for investigators of criminal gang activity (i.e., the Texas Gang Intervention Association and the Texas Violent Gang Task Force), also conducts training sessions in Texas, California, and Virginia for state and federal law enforcement officials regarding the Mexican Mafia and other Hispanic gangs.

According to Muniz, he has amassed the majority of his experience and training on this topic through his work in the field, namely, by interviewing somewhere between 50-100 current and former members of the Mexican Mafia and by speaking with at least a thousand other law enforcement officers who have investigated cases and crimes committed by the organization. In light of this testimony, we cannot say that the trial court abused its discretion when it found

Muniz qualified to testify as an expert on the Mexican Mafia.[2]

### ii) Reliability/Appropriateness of Subject Matter for Expert Testimony

Hernandez contends that Sergeant Muniz's expert testimony is not reliable because the Mexican Mafia has no documented organizational rules or bylaws that its members must follow and Muniz "is basing his opinion about an organization that fails to enforce its alleged informal rules." The reliability of "soft" science evidence (i.e., one based primarily on experience and training, as opposed to the scientific method) may be established by showing that: (1) the field of expertise involved is a legitimate one; (2) the subject matter of the expert's testimony is within the scope of that field; and (3) the expert's testimony properly relies upon or utilizes the principles involved in that field. *See Weatherred*, 15 S.W.3d at 542 (citing *Nenno* v. *State*, 970 S.W.2d 549, 560–61 (Tex. Crim. App. 1998), *overruled on other grounds by State v. Terrazas*, 4 S.W.3d 720, 727 (Tex. Crim. App. 1999)). We review the decision to admit such expert testimony under an abuse of discretion standard. *See Weatherred*, 15 S.W.3d at 542.

Muniz's testimony meets all three requirements. Muniz's field of expertise—gang behavior, specifically the Mexican Mafia—is generally accepted as a legitimate field of expertise. *See Morris v. State*, 361 S.W.3d 649, 656 & n.31 (Tex. Crim. App. 2011) (citing *Ortiz v. State*, 93 S.W.3d 79, 86 (Tex. Crim. App.

---

[2] We also note that Muniz has previously testified about the Mexican Mafia in other court proceedings.

2002)).  Second, Muniz's testimony regarding the purpose, history, hierarchical structure, and the rules and regulations that purportedly govern the organization and conduct of its members, as well as the type of distinctive tattoos that its members use to signify their membership in the organization, clearly fits within the scope of that field.  Finally, Muniz's testimony is derived from his field interviews with current and former Mexican Mafia members and collaboration with other law enforcement officials familiar with the organization.  Based upon this testimony, we cannot say that the trial court abused its discretion in admitting Muniz's expert testimony over Hernandez's reliability objections.

### iii) Relevance/Assistance to Fact-finder

Hernandez contends that Sergeant Muniz's testimony about the Mexican Mafia and Hernandez's membership in the organization is not relevant because there is no credible evidence establishing that the shooting was gang-related. Thus, there is no "fact" issue for the expert to assist the jury in deciding.

The admissibility of evidence during the punishment stage of a non-capital criminal trial is governed by article 37 of the Texas Code of Criminal Procedure. TEX. CODE CRIM. PROC. ANN. art. 37.07, § 3(a)(1) (West 2006).  Article 37.07 states in pertinent part that:

> evidence may be offered by the [S]tate and the defendant as to any matter the court deems relevant to sentencing, including but not limited to the prior criminal record of the defendant, his general reputation, his character, an opinion regarding his character. . .

44

TEX. CODE CRIM. PROC. ANN. art. 37.07, § 3(a)(1). Relevance in this context is "more a matter of policy" than an application of Rule of Evidence 401 and is better determined by "what would be helpful to the jury in determining the appropriate punishment." *Garcia v. State*, 239 S.W.3d 862, 865 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd) (citing *Mendiola v. State*, 21 S.W.3d 282, 285 (Tex. Crim. App. 2000)).

Even if Hernandez's shooting of Ismael is completely unrelated to the Mexican Mafia (as Hernandez suggests), testimony regarding the Mexican Mafia and Hernandez's membership in the organization is nonetheless relevant at punishment because it speaks to Hernandez's character. *Jones v. State*, 944 S.W.2d 642, 652–53 (Tex. Crim. App. 1996); *Beasley v. State*, 902 S.W.2d 452, 456 (Tex. Crim. App. 1995); *see also Ho v. State*, 171 S.W.3d 295, 305 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd) ("Even if appellant was no longer affiliated with the gang at the time of the shooting, evidence that he was a gang member is relevant—and thus admissible at punishment—because it relates to character."). Evidence of gang membership allows the jury to make an informed decision regarding the character of the guilty party when determining the appropriate punishment to assess. *See Beasley*, 902 S.W.2d at 456–57. Once evidence of gang membership is established, the prosecution must then present evidence of the gang's general activities to the jury. *See Beasley*, 902 S.W.2d at

456 (stating that evidence of gang's general activities is "essential" to jury's assessment of defendant's character because it allows jury to "determine if [the defendant's] gang membership is a positive or negative aspect of his character, and subsequently his character as a whole."); *see also Anderson v. State*, 901 S.W.2d 946, 950 (Tex. Crim. App. 1995) ("Although relevant, gang membership alone would be meaningless to a jury which has no knowledge of the gang's purpose or activities.").

Here, Muniz testified that at least three of Hernandez's tattoos were indicative of membership in the Mexican Mafia and that Hernandez is a confirmed member of the Mexican Mafia in the databases of the Texas Department of Criminal Justice and the Texas Department of Public Safety. He testified that he had also personally observed Hernandez associating with known Mexican Mafia members and hosting Mexican Mafia meetings at his home in Houston. Muniz further testified that the Mexican Mafia is a large gang known for engaging in criminal activity such as narcotics distribution, extortion, racketeering, kidnapping, burglary, assault, and murder for hire. Although he denied being a member of the Mexican Mafia at the time of trial, Hernandez admitted that he used to be a member of the organization. In light of this testimony, the trial court did not abuse its discretion when it overruled Hernandez's objection to the admissibility of such evidence on relevancy grounds.

## b) Rule 403

Hernandez further contends that the trial court erred by finding that the probative value of Sergeant Muniz's testimony regarding the Mexican Mafia and Hernandez's membership in the criminal enterprise outweighed its prejudicial effect on Hernandez under rule 403 of the Texas Rules of Evidence.

Although evidence regarding a defendant's gang membership may be relevant during the punishment phase, "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." TEX. R. EVID. 403. Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial. *Jones*, 944 S.W.2d at 652. Because all evidence is likely prejudicial to one party or another, this rule of evidence requires exclusion only when there is a clear disparity between the degree of prejudice of the offered evidence and its probative value. *Id*. Questions of the admissibility of evidence under Rule 403 are assigned to the trial court and are reviewable only for an abuse of discretion. *Id.*

Hernandez argues that Muniz's testimony that Hernandez is a member of an organization that kills for profit and for the protection of its members and refuses to cooperate with law enforcement is unfairly prejudicial because the jury will

47

infer from this testimony that the shooting was a gang killing that deserves the maximum punishment. Evidence of Hernandez's gang membership was obviously unfavorable to him, but under these circumstances it was not unfairly prejudicial. The testimony provided by Sergeant Muniz was clearly probative because it countered Hernandez's testimony that he shot the Perez brothers under the influence of sudden passion, and it provided the jury with an explanation as to why Hernandez shot the Perezes even though they were fighting with Olvera, not him. Furthermore, Muniz's testimony about the Mexican Mafia's reputation for violence and Hernandez's membership in the organization countered the testimony of Hernandez's family and friends that he was a non-violent and peaceful person. Under these circumstances, we hold that the trial court did not abuse its discretion when it overruled Hernandez's rule 403 objections.

### c) Conclusion

Having held that the trial court did not abuse its discretion when it overruled Hernandez's rule 403 and 702 objections, we overrule Hernandez's third point of error.

### 4) Admission of Lay Witness Testimony Regarding Mexican Mafia

In his fourth point of error, Hernandez claims that the trial court erred by allowing Paul Ramirez to testify during the punishment phase of trial about the Mexican Mafia and Hernandez's membership in the criminal organization.

Hernandez contends that Ramirez's testimony on this issue should have been excluded because it was irrelevant, and, in the alternative, even if it was relevant, the testimony should nevertheless have been excluded because the prejudicial effect of the testimony outweighed its probative value. According to Hernandez, the State intended to show through the admission of this unfairly prejudicial evidence that he "was a bad person because he acted in conformity with the evil ways of the Mexican Mafia" and "the jury made an emotional decision to assess a LIFE sentence based on the testimony of a paid informant who claimed that he personally knew that [Hernandez] was a member of the Mexican Mafia."

Hernandez's challenge to the relevancy and unfairly prejudicial nature of Ramirez's testimony is meritless. As previously discussed, the State established through expert testimony that Hernandez was a member of the Mexican Mafia, a large prison gang known for engaging in a wide variety of criminal activity, including narcotics distribution, extortion, racketeering, kidnapping, burglary, assault, and murder for hire. As such, testimony regarding the Mexican Mafia and Hernandez's membership in the organization is relevant and admissible at punishment because it speaks to Hernandez's character. *Jones*, 944 S.W.2d at 652–53; *Beasley*, 902 S.W.2d at 456. Like the testimony of Sergeant Muniz, Ramirez's testimony on this topic was clearly probative because it, too, explained why Hernandez shot the Perez brothers, even though he did not know them and did

not seem to have any personal motive for doing so, and it countered the testimony of Hernandez's family and friends that he was a non-violent and peaceful person. Ramirez's testimony also explained why, even though the two men had never met before, Hernandez met with him to discuss the shooting. Under these circumstances, we hold that the trial court did not abuse its discretion when it overruled Hernandez's relevancy and rule 403 objections.

We overrule Hernandez's fourth point of error.

## Conclusion

We affirm the judgment of the trial court.

## PER CURIAM

Panel consists of Justices Jennings, Higley, and Sharp.

Do not publish. TEX. R. APP. P. 47.2(b).